**TRANSCRIBED FROM DIGITAL RECORDING**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

S. JAIN, et al.,                      )
                                      )
            Plaintiffs,               )
                                      )
      vs.                             )  No. 17 C 0002
                                      )
BUTLER ILLINOIS SCHOOL DISTRICT 53,   )
et al,                                )  Chicago, Illinois
                                      )  July 11, 2017
            Defendants.               )  9:20 A.M.

        TRANSCRIPT OF PROCEEDINGS - Status and Motions
   BEFORE THE HONORABLE SIDNEY I. SCHENKIER, Magistrate Judge

APPEARANCES:

For the Plaintiffs:       MR. RICHARD P. CARO
                          724 North Northwest Highway
                          Apartment A
                          Park Ridge, Illinois  60068

                          LAW OFFICES OF FREDRICK R. HARBECKE
                          53 West Jackson Boulevard
                          Suite 1510
                          Chicago, Illinois  60604
                          BY:  MR. FREDRICK RAHN HARBECKE

For School District       ANCEL, GLINK, DIAMOND, BUSH,
Defendants:                 DICIANNI & KRAFTHEFER, P.C.
                          140 South Dearborn Street
                          6th Floor
                          Chicago, Illinois  60603
                          BY:  MS. LUCY B. BEDNAREK

                  PAMELA S. WARREN, CSR, RPR
                    Official Court Reporter
                   219 South Dearborn Street
                          Room 2342
                   Chicago, Illinois  60604
                       (312) 408-5100

**NOTE:  Please notify of correct speaker identification.
FAILURE TO SPEAK DIRECTLY INTO THE MICROPHONE MAKES PORTIONS
UNINTELLIGIBLE.**

**APPEARANCES:  Continued**

For Defendants Massey     HINSHAW & CULBERTSON LLP
and Roselli:              222 North LaSalle Street
                          Suite 300
                          Chicago, Illinois  60601
                          BY:  MS. KATHERINE GEORGIA SCHNAKE

(Proceedings held in open court:)

THE CLERK:  17 C 0002, Jain, et al. versus Butler Illinois School District 53, et al., status.

THE COURT:  All right.  We have plaintiffs's counsel participating by phone.

Please identify yourself.

MR. CARO:  Richard Caro for the plaintiffs.

THE COURT:  And then we have counsel who are here in the courtroom.  Why don't you each identify yourselves.

MR. HARBECKE:  Fred Harbecke, local counsel.

THE COURT:  For the plaintiff?

MR. HARBECKE:  For the plaintiff.

MS. BEDNAREK:  Lucy Bednarek for the school district defendants.

MS. SCHNAKE:  Kate Schnake for defendants Massey and Roselli.

THE COURT:  Okay.  Are we missing anybody?

MS. BEDNAREK:  No.

THE COURT:  Okay.  Well, we have got a number of motions that have been filed and various responses to motions.  I'm prepared to address them this morning.

Why don't we start with the motion by the school district school board and the law firm defendants to allow a limited waiver of the attorney-client privilege.  That's Docket Entry Number 88.

1    In that motion the movants seek a limited waiver with

2  respect to three particular documents that were attached.  And

3  I have looked at them for in camera review.  One was a

4  memorandum from Ms. Roselli to Dr. Wennstrom and Kelly Voliva

5  dated February 5th of 2016.

6    Another one is a memorandum by Ms. Massey to members

7  of the board of the Butler School District 53, that's dated

8  April 9th, concerning an investigatory report and findings into

9  a grievance filed by Ms. Julka.

10    And the other is an April 10th memorandum from

11  Ms. Massey to the board members concerning investigatory report

12  and findings into a grievance filed by Dr. Jain.

13    And what the movants say is they want to use these

14  documents to defend in the case, and so they want a limited

15  waiver that would not waive any privilege in those documents

16  and would not require them to produce anything else and may be

17  related to those documents for which you assert privilege.

18    The motion cites as authority Rule 502(e) of the

19  Federal Rules of Evidence.  The difficulty is that 502(e)

20  speaks to agreements between the parties.  There is no

21  agreement here with the plaintiff as to the limited waiver

22  which you propose.  The plaintiff filed a response to the

23  motion making it clear that plaintiffs do not agree.  They say

24  that they should be entitled to, I'll call it, secondary

25  material or source material for which you may be asserting

privilege that went into the memoranda or related materials,

essentially a 502(b) analysis which is whether when some

document that's privileged is produced, in fairness, other

related documents that are privileged ought to be produced as

well.

    So I don't see how I could enter an order under Rule

502(e), which depends on agreement of the parties.  And 502(b)

doesn't really authorize me to preempt that process absent

agreement of the parties.  So I deny the motion.

    I have a question -- couple questions though just in

terms of the roles of Ms. Massey and Ms. Roselli.

    So Ms. Massey was, I think, what's referred to as the

complaint manager.  Is that the right term?

    MS. SCHNAKE:  Yes.

    THE COURT:  Okay.

    MS. BEDNAREK:  She was the complaint manager.

    THE COURT:  And that is as part of this investigatory

process?

    MS. SCHNAKE:  Right.  What she did is she just --

well, I guess we can start with Ms. Roselli because she was

involved before Ms. Massey was involved, if that makes sense.

    THE COURT:  Well, I actually -- I just want to find

out their respective roles.

    MS. SCHNAKE:  Okay.

    THE COURT:  I understand Ms. Roselli was counsel to

1    the board.

2            MS. SCHNAKE:  Yes.

3            THE COURT:  Right?  Okay.

4            And Ms. Massey was complaint manager.

5            MS. SCHNAKE:  Yes.

6            THE COURT:  And I am very bad on acronyms.  The

7    process, is it a UGP process?

8            MS. SCHNAKE:  Uniform grievance --

9            THE COURT:  Uniform Grievance Process?

10           MS. SCHNAKE:  Correct.

11           THE COURT:  And under that process is the complaint

12   manager required to be an attorney?

13           MS. SCHNAKE:  I don't believe so.

14           THE COURT:  Okay.  All right.  So I guess one question

15   that you might reflect on is if somebody is the complaint

16   manager, does the fact they are an attorney necessarily mean

17   that what they do as a complaint manager is privileged?

18           I'm not making a ruling on that.  I ask you to think

19   about that because, for instance, somebody who may be on a

20   corporate board may have the title general counsel, vice

21   president of finance.  What the person does as vice president

22   of finance is not invariably privileged because that person is

23   wearing a particular hat.

24           And if the complaint manager is not required to be an

25   attorney, then I think you ought to look at this and make a

determination whether in whole or in part, you know, Ms. Massey

was acting as an attorney providing legal advice as opposed to

a complaint manager who might not be an attorney doing basic

investigatory work.  So I think that that's something that you

may want to look at with respect to at least her role.  So that

will be my ruling on the motion.

I know that these materials were submitted to me for

in camera review.  And I have looked at them, but as of this

time I'm not making a privilege determination because I don't

have a motion that asks me to do that.

Okay.  The next -- I have got a lot of paper here.  I

have got to make sure that I don't get anything mixed up.

Then we have plaintiffs's motion for protective order

concerning the deposition of Plaintiff A.  And that's Docket

Entry Number 82.  And a corresponding motion to compel that

deposition.  That is Docket Entry Number 83.

Based on the back and forth in the motions and

response, it appears that there is fundamentally two issues

remaining.  It sounds like you reached agreement on certain

things.  One of which is that Mr. Caro could appear remotely

for the deposition, that you wouldn't have the individual

defendants present at the deposition.

Two items that were open, it seemed to me, were, one,

should I actually preside over the deposition, and the other is

would the questions be, I guess, preapproved questions

1 submitted to and asked by a mental health professional?

2       Are those -- do you agree that those are fundamentally

3 the two issues?

4       MS. BEDNAREK:  Yes, that the plaintiff has requested.

5       THE COURT:  Okay.

6       MS. BEDNAREK:  With regard just to the minor

7 (unintelligible).

8       THE COURT:  Just to the minor, right.

9       And you agree, Mr. Caro?

10       MR. CARO:  Yes, your Honor.

11       THE COURT:  All right.  Let me say this.  You know,

12 whenever you have a witness who is young -- and I guess

13 Plaintiff A is now, what, 11 years old -- you know, there is

14 always concerns because for full grown mature adults testifying

15 in a legal process is often not a walk in the park.  So I am

16 sympathetic to the desire to provide some protection for that

17 individual.  And I am mindful of the plaintiffs's allegations

18 concerning the mental state of Plaintiff A without making any

19 determinations as to what that mental state is.

20       Right now, Mr. Caro, those are allegations.  And I

21 know that there are two reports that were submitted.  One by a

22 therapist who was terminated from that relationship now some

23 time ago and hasn't seen Plaintiff A for a while, and the other

24 by a person who is a therapist but also a relative.

25       And so I think right now you must appreciate that what

you are asserting in terms of child abuse and trauma are

allegations, and they are not proven facts in a legal process.

      MR. CARO:  I have submitted them to show the support

that --

      THE COURT:  I understand.

      MR. CARO:  -- the child --

      THE COURT:  And I have expressed to you some of the

limits right now of that support in terms of my deliberation

concerning what I think are fairly extreme limitations that are

being proposed.  I think the idea of having preapproved

questions asked by somebody who is not a lawyer is a very -- it

would certainly be a very unusual process.  I can't say

unprecedented, but very unusual process.

      We have Plaintiff A, who is a central player in the

allegations in this case.  We have obviously a desire and a

need to have his testimony on oath and to be tested at some

level by the adversary process, which, as I say, is

uncomfortable generally for people but is part of the burden

that is undertaken when somebody initiates a lawsuit, whatever

their years.  And the idea of having preapproved questions

asked by somebody who is not a lawyer makes it very difficult

for follow-up questions to be asked, to be able to go where the

trail of deposition answers may lead someone.  So I am not

going to accept the proposal that the questions be asked by

some therapist and that they be predetermined questions.

1    I also am not of the mind to sit and preside over the

2 deposition.  What I will do is require that the deposition take

3 place in my jury room, that the deposition be not only

4 transcribed but video and audio recorded to address any concern

5 about not simply what questions may be asked, but the manner in

6 which they are asked.  And I think that that should be a

7 sufficient safeguard.  And if any issues arise, and frankly I

8 don't expect that there will be any issues, you know, I'll be

9 around and we can discuss them.

10    Two other questions that I had with respect to the

11 deposition of Plaintiff A.  We have agreement about who is not

12 going to be in the room; that is, the individual defendants.

13    Do we have agreement about who is going to be in the

14 room?

15    MS. BEDNAREK:  Well, with regard to the school

16 district defendants, both myself and my co-counsel will be

17 present.  However only one of us, obviously, will be doing the

18 questioning, and I don't know about --

19    MS. SCHNAKE:  I'll be the one present for defendants

20 Massey and Roselli.

21    THE COURT:  So that's all from the defense contingent.

22    MS. BEDNAREK:  That's correct.

23    MS. SCHNAKE:  Uh-huh.

24    THE COURT:  All right.  And on your end, Mr. Caro, who

25 do you want to be there?

1       MR. CARO:  The defendants agreed that I can

2 participate remotely, electronically.

3       THE COURT:  Right.

4       MR. CARO:  And I have also encouraged the client to,

5 as an alternative, to use local counsel.  And if they work it

6 out, that would be great.

7       THE COURT:  Okay.

8       MR. CARO:  And I find that preferable.

9       THE COURT:  So it would either be you and your local

10 counsel.

11       MR. CARO:  Pardon me, your Honor?

12       THE COURT:  You might do it your remotely or your

13 local counsel may be there in the room or it may be both.

14       MR. CARO:  It -- it is not decided.  But at this point

15 I'm the only one who is going to be present electronically.

16       THE COURT:  Okay.

17       MS. BEDNAREK:  Your Honor, if I may, with regard

18 to -- we obviously have no objection to Mr. Caro --

19       THE COURT:  Yeah.

20       MS. BEDNAREK:  -- appearing remotely.

21       Is there a remote capability in the jury room?

22       THE COURT:  Jenny, we can set that up, can't we?

23    (Discussion off the record.)

24       THE COURT:  Oh, okay.  We'll do it in the courtroom.

25       MS. BEDNAREK:  In the courtroom?

1      THE COURT:  Yeah.  We have conference tables.  We do

2 video hook ups all the time.

3      MS. BEDNAREK:  That's fine, your Honor.

4      THE COURT:  All right.

5      MS. BEDNAREK:  And we have -- and just to let the

6 Court know, Mr. Caro has agreed to produce Plaintiff A on

7 August 14th --

8      THE COURT:  Okay.

9      MS. BEDNAREK:  -- whether -- I don't know whether the

10 jury room is -- or the courtroom would be available on the --

11      THE COURT:  That's Monday, isn't it?

12      MS. BEDNAREK:  It is.

13      THE COURT:  I think that that's going to be fine.

14      MS. BEDNAREK:  One other thing.

15      THE COURT:  What time?

16      MS. BEDNAREK:  We don't --

17      We had scheduled it for 10:00 A.M., but we can work

18 with the Court's schedule.

19      THE COURT:  Okay.  We'll talk about that.

20      And then what's your one other thing?

21      MS. BEDNAREK:  The one other thing is whether the

22 plaintiff's mother, who is also a plaintiff, S. Jain, will be

23 present.

24      THE COURT:  What's your position on that, Mr. Caro?

25      MR. CARO:  We prefer -- I think it is best if the

1   mother is not present, but the grandmother who is a

2   psychologist is present.

3       MS. BEDNAREK:  Well, I would object to that.

4   Obviously the mother is not only a plaintiff but a guardian.  I

5   would object to having the grandmother who is a psychologist

6   present.  She has no standing to be there.

7       THE COURT:  What's the basis for the grandmother to be

8   there?

9       MR. CARO:  She has counseled the child since January

10  of 2016, and he feels very comfortable with her.  And I thought

11  it would be less pressure on the child if she was there instead

12  in place of the mother.

13      If your Honor thinks the grandmother shouldn't be

14  there, then the mother should be.

15      THE COURT:  All right.  Well, the mother is a party.

16      MS. BEDNAREK:  But having --

17      THE COURT:  Any objection?

18      MS. BEDNAREK:  No objection to the mother being

19  present.

20      THE COURT:  All right.  The mother will be there.

21      But I think it is important to understand, Mr. Caro,

22  that -- and I think you need to make sure that Plaintiff A

23  understands and his mother understands that once he begins his

24  testimony, the witness is not supposed to discuss his testimony

25  with anybody --

1        MR. CARO:  Okay.

2        THE COURT:  -- whether it is his attorneys or his

3 mother.

4        One other thing is there -- has there been any

5 discussion about the length of time of the deposition?

6        MS. BEDNAREK:  No, other than we agreed to six hours

7 is probably unnecessary.  But we haven't discussed further than

8 that.

9        THE COURT:  Well, we're really talking about Plaintiff

10 A's testimony about what materials were consulted prior to the

11 tests.  We're talking about the interview on January 19th, I

12 think it was.

13        MS. BEDNAREK:  Right.

14        THE COURT:  Is that right?

15        And then we're talking about really the aftermath.

16        MS. BEDNAREK:  Also there is some allegations about

17 how this school district allegedly treated him following that.

18        THE COURT:  That's the aftermath.

19        MS. BEDNAREK:  Oh, okay.  I thought you were referring

20 to damages, his alleged damages.

21        THE COURT:  Well, that's part of his alleged damages,

22 correct?

23        MS. BEDNAREK:  Okay.

24        THE COURT:  Okay.

25        MS. BEDNAREK:  So it is not obviously --

1    THE COURT:  Is there any reason it can't be done

2   within four hours?

3    MS. BEDNAREK:  I think four hours is fine.

4    THE COURT:  All right.  Is that all right with you,

5   Mr. Caro?

6    MR. CARO:  Yes.

7    THE COURT:  And what I will do is say that four hours,

8   but to make sure that there is a break of ten minutes at least

9   every hour.

10    MS. BEDNAREK:  That's fine.

11    THE COURT:  All right.  With those restrictions I will

12   deny in part and grant in part the motion for protective order

13   and the motion to compel.

14    MS. BEDNAREK:  Your Honor, the motion to compel also

15   addressed the S. Jain's deposition and the father's deposition.

16   And I think that --

17    THE COURT:  Do you have agreement on that?

18    MS. BEDNAREK:  We do.  I believe so.  Is that Mr. Caro

19   has agreed to present the mother on August 15th at our offices.

20   And the father we proposed August 29th, but we have got -- have

21   no confirmation yet from Mr. Caro.

22    MR. CARO:  I have written several emails to him and

23   his wife, and I haven't got anything back.

24    THE COURT:  Okay.

25    MR. CARO:  He's been out of work for almost a year

1  because of the notoriety of this problem, and he's -- I think

2  he's trying to set up job interviews and will get back when,

3  you know, he's free.

4       But at this point all I can do is keep asking.

5       THE COURT:  Well, let me say this, it is seven weeks

6  between now and August 29th, and I certainly am hopeful that he

7  obtains employment.  But it would seem to me that during that

8  time period it should not be difficult to carve out a day for

9  the deposition.

10      MS. BEDNAREK:  And just if I could add as well, we

11  have already attempted to schedule in July and early August.

12  And August 29th was the date that plaintiff had suggested

13  was -- that Mr. Gold (phonetic) would be available, and yet we

14  haven't received confirmation.

15      THE COURT:  All right.  Well, here's what I will do,

16  since you have agreement that the plaintiff's mother will be

17  deposed on August 15th, we'll put that into the order.  And

18  with respect to the plaintiff's father, I will order that his

19  deposition take place by no later than August 31st.  And I want

20  a status report in seven days indicating what date has been

21  set.

22      MS. BEDNAREK:  Okay.

23      THE COURT:  And obviously depositions of the parents

24  do not need to be in my courtroom.

25      Why don't we take, if we can -- Mr. Caro, would you

stay on the line?  But I want to take up another couple cases

before we go on to the next items.  All right?

MR. CARO:  Yes.

(Discussion off the record.)

MR. HARBECKE:  Your Honor, may I be excused then?

THE COURT:  If it is okay with your co-counsel.

MR. HARBECKE:  Mr. Caro, if you don't mind, I have

other court matters I need to attend to.

Mr. Caro?

THE COURT:  Mr. Caro, can your co-counsel leave to go

to some other court matters?

MR. CARO:  Oh, yes, your Honor.  Sure.

THE COURT:  Thank you.

MR. HARBECKE:  Thank you.

(Whereupon the Court turned his attention to other matters

on his call.)

THE CLERK:  17 C 0002, Jain, et al. versus Butler

Illinois School District 53, et al., status and motion hearing.

THE COURT:  All right.  Mr. Caro, are you still with

us?

MR. CARO:  Yes, your Honor.

THE COURT:  Very good.  And we have counsel for the

defense here.

MS. BEDNAREK:  Yes.

THE COURT:  All right.  So now I want to turn to the

1  plaintiffs's motion to compel.  That's Docket Entry Number 86.

2  And then Massey and Roselli motion to compel, Docket Entry

3  Number 92.

4          MS. BEDNAREK:  Your Honor, before we do that, we would

5  like to readdress the motion for entry of an order permitting a

6  limited waiver of attorney-client privilege that your Honor

7  previously denied.  So my office -- we drafted that.  And when

8  we referenced Rule 502(e), it -- I remembered here that was

9  originally an agreed motion.

10         I have an email, that I actually just checked with my

11  phone, back on June 1st.  It was an agreed motion to have a

12  limited waiver, and that's why we reference that.  And I

13  suppose later, a few weeks later, after Mr. Caro changed his

14  position on it, we probably should have taken it out, and that

15  was maybe an error on our end.

16         But I think that the bigger issue, that I just want

17  the Court to be aware of, that the documents referenced in all

18  those reports have been produced a couple times, in the FOIA

19  request and in this case.  So if the concern is that this

20  report is referencing materials that they don't have access to,

21  that's not really that case.  I just want the Court to be aware

22  of that.

23         THE COURT:  I understand.

24         MS. BEDNAREK:  Okay.

25         THE COURT:  But you are still asking me to enter an

order that is saying something that you treat as privileged --

MS. BEDNAREK: Right.

THE COURT: -- should be produced without it being a waiver. And we're talking about an intentional production. Right? So we're not talking about, you know, 502(d), which gives me the authority to say that the production of something privileged is not a waiver of the privilege in that document in federal or state court. Okay?

That really was put into place to deal with, I'm producing lots of documents and maybe something slips through and, you know, I want to protect against that. It really doesn't deal, in my judgment, with an intentional decision to use something that you're claiming is privileged. That really is a 502(b) matter as to whether there is other things that are privileged, that are being withheld, that relate to what has been produced and whether, in fairness, that should also be produced.

You know, I don't know what the full universe of that is. And we'll talk in a minute about the privilege log issue. But 502(e) is -- and 502(e), as I have said, really addresses agreements between the parties.

So, Mr. Caro, is it true that at some earlier point you sent counsel an email saying that you were agreeable to their proposal to produce these three documents without it being a waiver of privilege in other documents?

1          MR. CARO:  Early on.  But then I withdrew that as I

2    thought about it.  The Massey report is a (unintelligible)

3    document.  And I said, I'm happy to get it if they get the

4    circuit judge's permission to unseal it.  They applied to have

5    it sealed, and language prevented my client from giving me a

6    copy of that document.  That was done intentionally and --

7          THE COURT:  Well, Mr. Caro --

8          MR. CARO:  -- I don't want to do anything --

9          THE COURT:  -- would you like the document?

10          MR. CARO:  Yes.

11          THE COURT:  Okay.

12          MR. CARO:  Well --

13          THE COURT:  Well, is there a way that the parties can

14    agree to the production of those three documents, and you can

15    take a look at them then?

16          MR. CARO:  On the -- excuse me, your Honor.  I only

17    want the Massey report, fact report.

18          THE COURT:  Well --

19          MS. SCHNAKE:  Which one?  I mean, there is --

20          MR. CARO:  Not the other privileged documents because

21    I think it would be unfair and unrepresentative of what

22    happened.

23          MS. SCHNAKE:  Well, your Honor, there are two Massey

24    reports, and then one Roselli report.

25          THE COURT:  But what he's saying is he wants one -- he

1    wants the Massey report concerning the Jain matter.

2            MS. SCHNAKE:  Uh-huh.

3            MR. CARO:  Right.

4            THE COURT:  And he doesn't want --

5            MR. CARO:  The fact report that was submitted and --

6            THE COURT:  Mr. Caro?  Mr. Caro?

7            MR. CARO:  Yes.

8            THE COURT:  You're going to have to indulge and not

9    jump in whenever you feel like it.

10            MR. CARO:  I'm sorry, your Honor.

11            THE COURT:  Thank you.

12            But he's concerned, I guess, that if the other ones

13    are produced because you want to use them, he may be

14    compromised because he doesn't have whatever else there may be.

15            Let me say this.  Right now I'm not going to reverse

16    my ruling.  When we talk about the privilege log, we can circle

17    back to this.  Okay?

18            All right.  So I would like to then go to the

19    competing -- not really competing, but the two motions to

20    compel, 86 and 92.  And I have to tell you that in reading the

21    discovery requests and the responses, it made me think about

22    Rule 1, you know, which says that discovery is supposed to be

23    calculated to achieve the just, speedy, and inexpensive

24    determination of the case.

25            And the amendment to Rule 1 in December of 2015 made

it clear that that's not simply the responsibility of the Court

in overseeing the discovery process, but it is the

responsibility of the parties to do that.  And the

responsibility of the parties, obviously, means also their

attorneys or their representatives in the litigation.

And, you know, when I looked at the interrogatories

and the responses, well, I really concluded that they are so

far removed from what Rule 1 has in mind that at this point I

don't see the interrogatory process here being a useful

process.

Mr. Caro, I've to say that I think you find it

difficult to ask an interrogatory in a way that's not

argumentative.  I think the defense, the Massey and Roselli

motion to compel looking at some of their interrogatories,

thinking in particular about Numbers 4 and 5, they are

basically getting everything that's relevant to the case.

I just don't see that that's a useful process.  The

responses are not helpful.  I don't think that the plaintiffs's

responses to the Massey and Roselli interrogatories, the few

that are answered, are really responsive.  They simply set

forth argument about the plaintiffs's position.  I think that

there is rather creative counting in terms of the numbers of

depositions and subparts that say I don't have to answer

anything after number five.

The defense did not identify by Bates number what

documents were produced responsive to the interrogatories. I
had ruled that on -- as matter of Rule 33(d) have to identify
the specific documents, and all I had -- I'm not talking about
the privilege log now. I'm not talking about identifying the
documents on the privilege log because as of right now what's
on the privilege log, the defense has taken the position they
don't have to produce that. So prior to a ruling on that
assertion, I don't think it is productive to make them identify
by Bates number what each of those logged documents would
relate to with respect to an interrogatory, especially given
the large volume of those documents.

On the other hand, interrogatory responses say, see
everything that Massey and Roselli produced. You know, what I
am hearing from the defense is that's a lot of pages. And what
you're saying is that all of those pages are responsive to
every single interrogatory. I just don't accept that.

So I draw the conclusion that we're going to be much
better off at this point with me terminating the right to serve
any further interrogatories or other written discovery. That
the parties should resort to the deposition process. And I
think that some of these questions that are asked in the
interrogatories, there is a better chance of getting productive
information where you have an iterative process, where you have
the opportunity to follow up on questions, and, frankly, where
people have less of an opportunity to play games when they're

1  sitting in the witness chair under oath.

2  So let me turn for a moment with -- then to the

3  plaintiffs's motion.  With respect to some of the things that

4  Mr. Caro raised, there was a general objection to the failure

5  of the defense to provide support for the Wennstrom

6  determination that there was cheating.  That's in paragraph 6

7  of the motion.  And paragraph 8 of the motion, a failure to

8  provide certain GOB questions.  None of those were tied to

9  specific requests as were some of the other issues raised, so

10  I'm not ruling on those.

11  Paragraph 9 talks about the failure to identify who

12  the substitute teacher was who filled in in the classroom when

13  Ms. Owen was at the -- I'll call it an interview, discussion.

14  I won't call it an interrogation, and I won't call it a tea

15  party.  But who was in the room filling in for Ms. Owen on the

16  idea that that person could be examined, as I understand it, to

17  determine whether Ms. Owen was away from the classroom for more

18  than an hour to support the plaintiffs's version about how long

19  the interview took place or was only for 15 minutes to support

20  the defense version.

21  And I guess that with respect to the interrogatories,

22  some were withdrawn where that question was asked of certain

23  people.  The people who were -- it was asked of said they

24  didn't know who it was.  So I just have a simple question.

25  Does the defense know who sat in for Ms. Owen in the room?

1          MS. BEDNAREK:  I don't.

2          THE COURT:  Nobody knows.

3          MS. BEDNAREK:  It would have to be -- we would have to

4     do a full school whole of everyone that would have been

5     available and -- because we have aides may have sat in.

6          THE COURT:  Have you asked Ms. Owen whether she

7     recalls?  Because it was Ms. Owen's classroom, right?

8          MS. BEDNAREK:  I believe that she does not recall

9     either.

10          THE COURT:  Because --

11          MS. BEDNAREK:  I can --

12          THE COURT:  Because this interrogatory that asks for

13     this information was withdrawn as to her.

14          MS. BEDNAREK:  Right.

15          THE COURT:  So my question is since it was Ms. Owen

16     whose classroom it was, it was -- presumably the person was in

17     there when Ms. Owen left the classroom.  The person was in

18     there when Ms. Owen returned to the classroom.  Can we figure

19     that out?

20          MS. BEDNAREK:  Your Honor, I will -- we will do our

21     best to investigate that further.  It may be -- the response

22     may be the same of I don't know, but we will due diligence in

23     investigating that.

24          THE COURT:  Okay.  Provide your information that you

25     have in response to that by July 21st.

1    There are a number of interrogatories that are call

2 out with respect to the individual defendants that suffered

3 from the situation I described, failure to identify by Bates

4 number what's being referenced in the Rule 33(d) response,

5 instead generically saying Massey and Roselli documents.

6    Were those -- the ones that were produced, were they

7 Bates numbered?

8    MS. SCHNAKE:  Yes.

9    THE COURT:  Okay.

10    MS. SCHNAKE:  There is 4000 documents

11 (unintelligible.)

12    THE COURT:  All right.  Okay.

13    MS. BEDNAREK:  There is 4000 pages.

14    THE COURT:  Right.  So I want you to go back and

15 provide whatever for every interrogatory where you said, see

16 Roselli and Massey documents, what Bates numbers are those

17 documents pertaining to the specific interrogatories.  I

18 ordered that before.  I don't think my order was unclear.  And,

19 you know, Massey and Roselli say, well, you know, that really

20 wasn't pertaining to us because the motion that led to that

21 order wasn't pertaining to Massey and Roselli.  But I see no

22 reason they shouldn't do it, so do it.  That is to be done by

23 July 21st.

24    MS. SCHNAKE:  Your Honor, I am in depositions all next

25 week.  I --

          THE COURT:  Are you the only attorney on this one?

          MS. SCHNAKE:  I am not.  However, it -- based on the
number of records, I just think -- I'm just requesting an
additional seven days to the 28th.

          THE COURT:  All right.  July 28th.

          One of the interrogatories that is the subject of the
motion is for Voliva, Number 27, documents concerning her
resignation.

          Mr. Caro, would you tell me your -- briefly your
thought about the relevance of that?

          MR. CARO:  The suspicion is that it was related to or
what happened with the -- with this cheating activity and
response.  She -- she resigned a few days before the
(unintelligible) school year and no explanation.  And the
thinking is that it may have been related -- it would probably
have (unintelligible) resignation and probably related to
something that happened with the -- with the investigation and
follow up that -- missing documents, the recording that
disappeared, so on and so forth.

          THE COURT:  Okay.  Response?

          MS. BEDNAREK:  Your Honor, her resignation was
voluntary.  She was not terminated, and it did not relate to
this incident at issue.

          THE COURT:  All right.  Produce any documents
concerning her resignation.

1    MS. BEDNAREK:  Well, your Honor, I'm not sure whether
2  the protective order in place covers her personnel records.  If
3  it does not, we will need to file a motion for protective order
4  regarding that.
5    THE COURT:  Well, no, is there any objection to it
6  being produced pursuant to the protective order, Mr. Caro.
7    MR. CARO:  Oh, no, not at all.
8    THE COURT:  All right.  You can do that by July 28th.
9    MS. BEDNAREK:  Okay.
10    THE COURT:  All right.  With -- that's what I will
11  order compelled from the specific interrogatory responses
12  raised in the plaintiffs's motion.  Otherwise the motion is
13  denied.
14    With respect to the Massey, Roselli motion, for the
15  reasons I have earlier stated concerning the interrogatory
16  responses, I deny the motion as to the interrogatory -- the
17  motion to compel as to the interrogatories.  And I -- in saying
18  that, I want it to be clear that I don't endorse the
19  plaintiffs's approach to the way you answered the
20  interrogatories, but I just don't think that going back,
21  especially given the discovery schedule we have, is going to
22  yield a productive result.  As I say, I think it is time to get
23  past this process.  We'll get people under oath and have them
24  testify.
25    Now with respect to the document requests, I have

taken a look at those, and I would indicate that there is
substantial overlap between the document requests and the
interrogatories anyway. So I will grant the motion to compel
as to Document Requests 5 through 8, 12 through 13, and 19
through 34.

With respect to Requests 9 through 11 and 14 through
17, those all go to potential damage claims. And I will order
those to be produced, only to the extent that the plaintiff is
seeking damages for those particular items.

So that says -- that means, Mr. Caro, with respect to
those requests, you answer them either by producing documents
or saying, we are not seeking damages based on this -- these --
or we're not seeking this category of damages.

I deny the motion as to Document Requests 1
through -- 1 and 2 and Number 4 as overbroad.

Request 3 is duplicative of the Rule 26(a)(1)
disclosures.

Request 35, which seeks trial exhibits, and that's
going to be a matter of the pretrial order scheduling.

Request 36, which seeks discovery relied on in a
written discovery responses, which I don't think is no
longer -- is any longer relevant given my ruling on the
interrogatories.

I have Request 37, which seeks expert disclosures, and
that will be for Judge Guzman to set any schedule for expert

disclosures.

The only remaining item on the request is 18, and that's other litigation involving the plaintiffs. I guess one question that I have, Mr. Caro, is whether the plaintiffs have been involved in other litigation.

MR. CARO: The only other litigation I know of is this -- related DuPage County Circuit Court case.

THE COURT: All right. Well, it wouldn't have been very hard to say that, would it?

MR. CARO: No.

THE COURT: Well, I always wonder why people argue about things that don't drop to the bottom line, so I will require you to answer that request.

If there is something other than DuPage County litigation, then disclose it.

MR. CARO: Yes, your Honor. One --

THE COURT: Now I was going to give you until July 28th to produce those documents, which tracks With the deadline I have given to the defense. Is that okay with you?

MR. CARO: Yes, your Honor.

THE COURT: All right.

MR. CARO: In terms of producing documents, may we refer to documents that were already produced?

THE COURT: Already produced by whom?

MR. CARO: By -- on March 2nd --

1          THE COURT:  No.

2          MR. CARO:  -- I produced --

3          THE COURT:  Mr. Caro, produced by you?

4          MR. CARO:  By plaintiffs.  They were produced by

5     plaintiff.

6          THE COURT:  You can certainly do that, but I -- just

7     as have wanted, and I'm requiring them to identify by Bates

8     number the documents, you should do the same.

9          So that, I think, takes care of the motions that have

10    been filed.  I want to talk for a moment about the privilege

11    log which, judging by the CD-ROM I got, is roughly 4400

12    documents, 37,000 plus pages.

13         Is that right?

14         MS. BEDNAREK:  Right.

15         THE COURT:  Okay.  Now it seemed like the documents

16    all had the RS prefix.  So they did all come from the files of

17    Robbins Schwartz?

18         MS. BEDNAREK:  Yes, that was our Bates numbering that

19    we put on the documents.

20         THE COURT:  Okay.  They all came from those files.

21         MS. BEDNAREK:  Yes.

22         THE COURT:  Okay.  Now does the log identify who were

23    CCs on the various emails as opposed to simply the direct

24    recipients?

25         MS. BEDNAREK:  I don't know that there is another

column for that. I can add the column to include the CCs. I
didn't think about that.

THE COURT: Well, that -- I mean, that's kind of
important because one way somebody, even with a document that's
privileged, may lose the privilege is if they have disclosed it
to somebody who is outside the warm embrace of the privilege.
So you need to know who gets it.

MS. BEDNAREK: Right.

THE COURT: Okay. Now there seems to be a lot of
material in there that's about -- that is during the state
court matter --

MS. BEDNAREK: Uh-huh.

THE COURT: -- and in this federal court matter. And
so I'm wondering whether you have logged documents that are
between the defendants here and counsel concerning the lawsuit.

MS. BEDNAREK: Concerning this lawsuit --

THE COURT: Yeah.

MS. BEDNAREK: -- or the state court lawsuit?

THE COURT: Either.

MS. BEDNAREK: I believe I logged things for the state
court lawsuit. I -- I'm not sure for this lawsuit because I
believe that the request wouldn't have included what -- if --

THE COURT: Well --

MS. BEDNAREK: You know, I don't think that it would
have included that.

```
 1            THE COURT:  Well, let me -- Mr. Caro, I take it that
 2    you're not interested in having them log communications that
 3    they saw are privileged.  Well, let me ask this.  Do you want
 4    them to log things that they say are privileged that --
 5            MR. CARO:  No.  Part of our problem --
 6            THE COURT:  -- post-date -- you need to let me finish
 7    my --
 8            MR. CARO:  Part of our problem is --
 9            THE COURT:  -- question.
10            MR. CARO:  -- we have thousands of documents listed in
11    the privilege log that weren't requested.
12            THE COURT:  Mr. Caro?
13            MR. CARO:  I'm not interested in attorney-client
14    communications --
15            THE COURT:  Mr. --
16            MR. CARO:  -- in the circuit court case or in this
17    court case.
18            THE COURT:  Okay.
19            MR. CARO:  They are listed.
20            THE COURT:  All right.  And in terms of saying in this
21    case or in the Circuit Court case, as a barometer for that can
22    we say that postdate the filing of those cases?
23            Mr. Caro?
24            MR. CARO:  Oh, I'm sorry.  I -- I think there were
25    some in August, possibly July, but I would have to go through
```

1   it.  But --

2          THE COURT:  No, what I am asking you --

3          MR. CARO:  -- we were --

4          THE COURT:  -- if we said --

5          MR. CARO:  Oh.

6          THE COURT:  -- the list should not include documents

7   for which privilege or work product was asserted, that postdate

8   the state court suit or the federal suit.

9          MR. CARO:  Yes, your Honor.

10         THE COURT:  Okay.  So cut those out.

11         MR. CARO:  Yes.

12         MS. BEDNAREK:  So the date that the state court was

13  filed, anything after that --

14         THE COURT:  Yes.

15         MS. BEDNAREK:  -- is --

16         THE COURT:  Right.

17         MS. BEDNAREK:  -- off the table.

18         THE COURT:  Okay?

19         MS. BEDNAREK:  Fine.  Okay.

20         THE COURT:  So that should skinny it down quite a bit,

21  right?

22         MS. BEDNAREK:  Some.  Not -- I mean, there is -- well,

23  we'll get to it, but there is a lot in there.

24         THE COURT:  Now the log doesn't always identify, at

25  least to my untrained eye in your matter, who is an attorney.

So is Heidi Katz an attorney?

MS. BEDNAREK:  If it is from the Robbins Schwartz --

THE COURT:  No, I don't want you to tell me what's in a file.  I want you to tell me who is on attorney.

Is Phil Gerner an attorney?

Is Catherine Locallo an attorney?

MS. BEDNAREK:  Locallo is.  Yes, she is.

THE COURT:  Okay.  You have got to identify who the attorneys are.  For somebody to make a judgment about whether there is a privilege, you want to know who is the attorney.  Because there are some that aren't involving Massey or Roselli, and it is not clear who the attorney is.

MS. SCHNAKE:  If it is an email that was sent from, for example, Massey's assistant or Roselli's assistant, I don't know that it -- I guess I can distinguish that it is from the assistant, but the -- it wouldn't matter either way, I don't think, as far as privilege is concerned if it is within the law firm.

THE COURT:  Well, I don't know where -- again I don't know who these people are.  See, I don't know what was generated outside the law firm and provided to the law firm --

MS. SCHNAKE:  Okay.

THE COURT:  -- or versus what was directly sent to the law firm or generated by the law firm.  That's where this ambiguity becomes a potential issue.

1        What was the date that Massey was engaged to be the

2   complaint manager, do you know?

3        MS. SCHNAKE:  I don't (unintelligible), and it would

4   have been shortly after the --

5        THE COURT:  Okay.

6        MS. SCHNAKE:  -- the complaint was filed.

7        THE COURT:  Okay.  The complaint?

8        MS. BEDNAREK:  The --

9        THE COURT:  The UGP.

10       MS. SCHNAKE:  -- investigation complaint, right.

11       THE COURT:  And Roselli, when did she begin providing

12  advice to Wennstrom and the board regarding this matter?

13       MS. SCHNAKE:  For this case --

14       THE COURT:  What --

15       MS. SCHNAKE:  -- the 19th.  I believe it was the 19th

16  that was the first that I found, I think.

17       THE COURT:  The 19th of?

18       MS. SCHNAKE:  January.

19       THE COURT:  Okay.

20       MS. SCHNAKE:  2016.

21       THE COURT:  Prior to or after the discussion with

22  Plaintiff A?

23       MS. SCHNAKE:  That I don't know.

24       THE COURT:  Okay.

25       MS. SCHNAKE:  I could find out --

1          THE COURT:  Right.

2          MS. SCHNAKE:  -- the exact time that they --

3          THE COURT:  I think you should take a look at that

4    because that may bear on issues concerning privilege concerning

5    whatever notes there may be or whatever happened prior to

6    January 19th.  Okay?

7          My point here is that if people take notes, they

8    prepare things, it may be that there is factual material there

9    that is not privileged.  Communication of it is privileged, but

10   that doesn't make the underlying initial creation privileged,

11   especially if it predated an attorney-client relationship.  So

12   I think you need to take a look at those matters.

13         Now you said that various source material has been

14   produced that's -- in -- reflected in the memos that you

15   submitted to me for in camera review.

16         MS. BEDNAREK:  I'm sorry, your Honor, can you repeat

17   that?

18         THE COURT:  You submitted to me the various memos for

19   in camera review.

20         MS. BEDNAREK:  Correct.

21         THE COURT:  And you said that various source material

22   referenced in there has been produced.

23         MS. BEDNAREK:  All the exhibits have been produced.

24         THE COURT:  Okay.  Did Wennstrom or Voliva -- is it

25   Voliva or --

1          MS. BEDNAREK:  Voliva.

2          THE COURT:  Voliva.  -- or Owen make notes of the

3   interview with Plaintiff A?

4          MS. BEDNAREK:  I don't believe that there are any

5   notes that are still in existence.

6          THE COURT:  Okay.  So which it does not exactly

7   address my question.

8          MS. BEDNAREK:  Right.  If there were any notes --

9          THE COURT:  Did they take -- did they take notes?

10         MS. BEDNAREK:  Not to my knowledge, your Honor.  But I

11  will have to double check on that.

12         THE COURT:  Okay.

13         MS. BEDNAREK:  Actually that's not right -- I

14  misspoke.  I believe that there were some notes, and I believe

15  that -- I will to double check on that too.

16         THE COURT:  Do you know whether those still exist?

17         MS. BEDNAREK:  I don't.  If they -- I don't know that

18  either.

19         THE COURT:  All right.  I think you need to look at

20  that.

21         MS. BEDNAREK:  True.

22         THE COURT:  There is a discussion of time sheets.

23  And, Mr. Caro, you reference at some point -- well, let me ask

24  this question.  The invoices that have been produced, do they

25  show what work was done on any particular day or are they

1  simply tabulation of hours and rates?

2         MS. BEDNAREK:  Time entries.  So you will have -- I'm

3  sorry, I thought -- are you asking him or --

4         THE COURT:  Yeah.  Go ahead, Mr. Caro.

5         MR. CARO:  The invoices that were produced from

6  September 2016 and forward, that's for the period in issue.

7  They said they have would produce those invoices.  And I

8  pointed out that time sheets are preferred because they would

9  show work done that was not billed.

10        THE COURT:  Okay.  So there is an assumption there,

11  which is that time was written off.

12        MR. CARO:  Yes.

13        THE COURT:  Was time written off?

14        MR. CARO:  And it may be -- and it may be important.

15        MS. BEDNAREK:  I have gone through some of the

16  invoices, and I have seen that there are entries where the time

17  wasn't written off but the client was charged.

18        THE COURT:  Let me say that -- I guess what I would

19  say is let's forget for the moment about whether all the time

20  was billed.  The invoice shows the work that was done.

21        MS. BEDNAREK:  Yes.

22        THE COURT:  On a day-by-day basis, rights?

23        MS. BEDNAREK:  Yes.

24        THE COURT:  By the attorneys who did it.

25        MS. BEDNAREK:  Yeah.

1          THE COURT:  And how much time they spent.

2          MS. BEDNAREK:  Yes.

3          THE COURT:  The invoices show that.

4          MS. BEDNAREK:  Uh-huh.

5          THE COURT:  So do the time records show any of those

6     things that the invoices don't show?

7          MS. BEDNAREK:  I haven't even seen time records.  But

8     all the time record would be would be a detailed entry that's

9     on the invoice.

10         THE COURT:  Well, and my point that you guys are

11    having certain different perhaps assumptions.  Mr. Caro's

12    assumption is if time wasn't billed, then the work that was

13    done wasn't shown to the client on the invoice.

14         You're assumption is that if there was a write off,

15    that work was shown, but the client wasn't charged for that

16    work.

17         MS. BEDNAREK:  Correct, because I have seen that on

18    the invoices.  It was a --

19         THE COURT:  Right.

20         MS. BEDNAREK:  -- point (unintelligible).

21         THE COURT:  So why don't you just look to verify that

22    there is nothing on the time sheets that isn't on the invoices

23    in terms of what time was spent on each day.

24         MS. BEDNAREK:  I can do that.  I think that -- and we

25    have put this in our motion.  I think the concern is what --

1   I'm not sure what that has to do with anything.  This isn't a

2   malpractice case.

3          THE COURT:  I know.

4          MS. BEDNAREK:  They are not alleging fraudulent

5   billing.  It would be privileged anyway.  You know, so I'm not

6   sure where -- to --

7          THE COURT:  Well --

8          MS. BEDNAREK:  -- where that's taking us.

9          THE COURT:  -- you have given him the invoices, right?

10         MS. BEDNAREK:  Because it was produced in underlying

11  FOIA.  And I figured if they got it in the FOIA, they may as

12  well get it in this case as well.

13         THE COURT:  Well, if they got it in the FOIA, then is

14  it privileged?

15         MS. BEDNAREK:  No.

16         THE COURT:  Okay.

17         MS. BEDNAREK:  The invoices were redacted.

18         THE COURT:  Okay.

19         MS. BEDNAREK:  And they received redacted copies of

20  those --

21         THE COURT:  Okay.

22         MS. BEDNAREK:  -- so that's not privileged.  But the

23  time at the -- the billing entries and whatever system they

24  used to enter in their time, that's a different issue.

25         THE COURT:  All right.  Is there a particular point in

1  time at which you consider this important, Mr. Caro?

2  MR. CARO:  Yes, your Honor.  The pre-January 19th

3  period was -- the January invoice is not listed as one that

4  would be produced.  And Wennstrom seemed to be very scrupulous

5  about clearing everything with Roselli.  And there is this big

6  gap from the start of the investigation, and then -- and then a

7  first century in the privilege log of January 19th.

8  THE COURT:  So -- and I heard counsel today say that

9  Roselli first started providing advice to the board and to

10  Wennstrom concerning this particular academic matter on January

11  19th.

12  MS. BEDNAREK:  That's my understanding of it.  From

13  what I have read on the privilege log, that's the right

14  belief.

15  THE COURT:  All right.  So -- but that kind of

16  sharpens the focus, right?  So why don't you look at time

17  records that are in the month of January prior to the 19th to

18  verify this.  Okay?

19  MS. BEDNAREK:  We can do that.

20  THE COURT:  Because that's what you are focusing on,

21  right, Mr. Caro?

22  MR. CARO:  Yes.

23  THE COURT:  Okay.

24  MR. CARO:  Because -- of other invoices -- we haven't

25  seen the invoices of the first half of 2016, but I assume they

1   will be comparable of the ones that were produced.

2           THE COURT:  Okay.

3           MR. CARO:  And my recollection is they do not show --

4   the ones that were produced do not show unbilled charges.

5           MS. BEDNAREK:  I can email him and point him to it.

6           THE COURT:  All right.

7           MS. BEDNAREK:  You know, I don't know what else --

8           THE COURT:  Well, I think that you should verify on

9   the defense side your points about what the invoices show.

10  That when time is written off, it is not that they're writing

11  off the entry as -- they're not eliminating the entry, they're

12  simply revealing that but not charging for it.

13          MS. BEDNAREK:  Uh-huh.

14          THE COURT:  Correct?

15          MS. BEDNAREK:  Right.

16          THE COURT:  All right.  So you should talk about that

17  among each other and see if you can't resolve that particular

18  issue.

19          So circling back now to the privilege log.

20          MS. BEDNAREK:  Yes.

21          THE COURT:  If we are going to eliminate documents

22  that are post suit that you logged, state or federal, that

23  should narrow it quite a bit.

24          So then with respect to what is left, is it your

25  position, Mr. Caro, that none of them is privileged?

1    MR. CARO:  No.  Oh, no, your Honor.  I think there are

2    privileged communications --

3    THE COURT:  Okay.

4    MR. CARO:  -- but --

5    THE COURT:  All right.  Well, here's what -- and I had

6    asked everybody before to come up with some method to sample

7    that.  Have you done that?  Or was everybody simply too stunned

8    by the volume to even embark on the effort yet?

9    MR. CARO:  I started that, your Honor, and I'm almost

10   complete.  And I have to cut down what my requests are.

11   THE COURT:  Okay.  Well, again, I don't know if you

12   are requesting things that are post litigation, but that would

13   be an easy place to cut down.

14   MR. CARO:  No, it is just for the period that I am

15   interested in, the proceedings at the school level.

16   THE COURT:  Okay.  And what I usually do on these

17   types of situations -- and let me ask Mr. Caro, you say you're

18   almost done.  How many have you identified thus far?

19   MR. CARO:  Oh, I haven't counted up.  There is a good

20   number.  Part of the problem is there are many, many

21   duplicates, and -- and, you know, and there could be four, five

22   copies of the same document, and I will try to select one.

23   THE COURT:  Okay.

24   MR. CARO:  It would be helpful if -- if they could

25   just tell me the category that applies to Roselli, the category

that applies to Massey, the category numbers that reply to

(unintelligible) school officials.

THE COURT:  I'm not sure what you said.

MR. CARO:  The item --

THE COURT:  I'm not sure I know what you mean by

replied to.

MR. CARO:  Oh, okay.  The Bates numbers appear to be

assigned to -- coming out for certain -- certain person's file.

So that an email sent from Roselli to Wennstrom to Voliva may

be produced three times and possibly more duplicates.

MS. BEDNAREK:  I can address that.  When we upload

documents into our reviewer, it automatically deduplicates so

that there aren't duplicative documents.  They may have similar

subject matters and they may have similar subject lines in

emails and similar persons, but it is not necessarily the same

document because it would have been eliminated when we upload

documents.

MR. CARO:  Generally my past experience, you only

produce duplicates, which are different, you know, this

(unintelligible) change.

THE COURT:  So one of your many disagreements, as I

hear defense counsel saying, that they have a system that

deduplicates the production.  So she's saying there aren't

duplicates in the sense of identical documents.

And you're saying there are in the sense of identical

documents, at least that's what I understand you to be saying,

Mr. Caro.

      But I can't mediate that right now or decide that

issue right now.  So when do you think you'll be done with your

process, Mr. Caro, of going through the log documents and

identifying the ones you may be interested in?

      MR. CARO:  This week.

      THE COURT:  Okay.

      MS. BEDNAREK:  And just to add to that, I think maybe

-- because Mr. Caro and I had spoken last week and we kind of

came to an agreement on some of the revisions that need to be

made to the log --

      THE COURT:  Yes.

      MS. BEDNAREK:  -- and I need to make those revisions.

I would like to think I would be done by Friday of this week.

Monday at the latest.  I think maybe it would help him if I

give him a more detailed log for him than to identify what

documents, just to get a time frame.

      THE COURT:  Okay.  That's fine.  Can you do that by

the end of the week?

      MS. BEDNAREK:  I will try -- yes, I --

      THE COURT:  Okay.

      MS. BEDNAREK:  I will try really hard to get that done

by Friday.

      THE COURT:  All right.  And then I don't know if you

can also go through, and for the people who are not identified

in terms of their function -- you don't even have to do it on

every entry.  But go through and create a key that says, Person

A, attorney at Butler Rubin.

And, B --

MS. BEDNAREK:  Person A, assistant --

THE COURT:  -- assistant.  C, tech person at whatever.

Just so when you're going through it, you can go

(unintelligible) and know who that is.

Again, it may that be Mr. Caro knows who that is, but

I don't.  And if in the end I have to decide any of this, I

need to know that.  Okay?

But then you don't have to go through line by line and

change the log, you just have to create a master key.  All

right?

MS. BEDNAREK:  Okay.

THE COURT:  So let's include that in your task.

MS. BEDNAREK:  Okay.

THE COURT:  All right.  And then do you think that you

all could meet and confer about the privilege log documents by

just say a week or ten days after that?

MS. BEDNAREK:  Sure.

THE COURT:  All right.  So I'll let -- do you think

the 24th you can do that?

MS. BEDNAREK:  Yes.

THE COURT:  Okay.  Now one of the things that you can do -- and you'll see what the volume is of those documents.  You could reach various agreements.  You could say -- again depending on the volume, you could have an agreement that these are produced, and it doesn't waive any other privilege.  That these are the openly ones he's interested in.  You could at that point consider a 502(e) order, which would have also then address your issues concerning these other reports.

You could if you want to -- if he is doubtful, if Mr. Caro is doubtful that this is really privileged, you could have an agreement that he could have, you know, what's called sometimes a quick peak.  Okay?  With an agreement no waiver, here.  Just look at this, and you can see it is privileged.  People do that.

Without Mr. Caro getting the document, without any waiver of your claim of privilege.  Those are different, you know, strategies that people may use if they want to try to address this.  But whatever strategies you use, I want a report by July 31st about what documents are in an issue, and a proposal as to how we would go about that in terms of determining the claim of privilege.

And then we'll set the matter for a status on Friday, August 4th at 9:00 o'clock.

MS. BEDNAREK:  Your Honor, while I could potentially have another -- I'm not available that day.  While I could have

my co-counsel, I don't know her availability, so --

(unintelligible) two that -- is there another that we could

set?

      THE COURT:  Okay.  And you know you're not available?

      MS. BEDNAREK:  I know I'm not available.

      THE COURT:  Okay.

      MS. BEDNAREK:  I'm out of the office.

      THE COURT:  All right.  Jenny, we set something on

August 7th at 9:30 today, right?

      THE CLERK:  Yes, we did, Judge.

      THE COURT:  August 7th, 9:00 o'clock.

      Now, you know, to summarize, you're going to have this

revised log by the end of this week.  Maybe Monday.

      MS. BEDNAREK:  I will try real hard on Friday.

      THE COURT:  But then you -- by the 24th you'll meet

and confer to go over what documents are in issue.  And I would

urge you to really think about some of these strategies for

addressing the issues because, at least my experience in

privileged log issues, is that oftentimes people aren't really

so concerned with producing the information.  It is not that

they're concerned it says, oh, my God, we're cooked.  It is

that they don't want it to be deemed a waiver of privilege on

the subject matter.  So they're concerned about it.

      But if that's the situation, you know, then there are

different strategies that can be used, again, avoid the

1  privilege issue, whether it is a 502(e) order or a quick peak.

2  So you might think about that.

3        But whatever the result is on the 24th -- on the 31st,

4  you'll provide a written report that identifies the volume of

5  documents that are in dispute on the privilege log.  And in

6  dispute I mean that Mr. Caro is seeking production of.

7        And propose a mechanism for resolving those issues.

8  And depending on the volume, that may be a sampling process.

9        And then we will have a status to talk about that and

10 other things on August 7th at 9:00 A.M.

11       In the meantime, the additional production that I

12 talked about in terms of the documents and with respect to the

13 defendants -- the identification of the documents referenced

14 as a response to interrogatories, all of those are due July

15 28th.

16       The materials concerning Ms. Voliva's resignation are

17 due July 21st.  Actually we made that the 28th as well.  So

18 we'll keep it on that same track.

19       And then we will add in to the order that the

20 deposition of Plaintiff A, subject to the various protocols I

21 have identified, will take place commencing at 10:00 A.M., on

22 August 14th in my courtroom.

23       The deposition of the mother will take place August

24 15th.

25       And the deposition of the father will take place by

August 31st.

And by the 18th the parties are to give me a status report indicating the date that's been agreed to for that deposition.

If there is no agreement, then I will set a date. And if I have to do that, the date will not be subject to change.

I think that that covers everything that we talked about this morning.

MS. BEDNAREK: We had said we would circle back to the limited waiver issue.

THE COURT: Right. I still don't see how I can give you a limited waiver. I mean, what you said to me is that the underlying material that's in those reports has been produced.

MS. BEDNAREK: The exhibits that were attached --

THE COURT: The exhibits.

MS. BEDNAREK: -- and then (unintelligible).

THE COURT: So I don't know if there are notes of interviews. I don't know what's in -- on the log, are there interview notes, things of that character?

MS. BEDNAREK: I don't have the list in front of me of the exhibits.

THE COURT. Well, I guess in the end if you're saying that there are other privilege documents that bear on those reports, that really don't need to be disclosed under a 502(b) analysis because in fairness it is not necessary, then you can

1  produce these.  And, you know, if you need to have a dispute

2  under 502(b), then we will have a dispute under 502(b).  But I

3  don't see how I can order the production of this and give you a

4  protection under 502(e) where there is no agreement.

5          And as you say, I think, you know, one of the things

6  that I have asked you about is, again, the role of the

7  complaint manager who does not have to be an attorney.  And so

8  I think that one of the things you might want to address is

9  whether the reports by the complaint manager in whole or in

10 part are privileged.  Is everything in there the work of an

11 attorney or is it the work of underlying factual investigation?

12 It would be no different if it was a non-attorney.

13         Obviously there is separate -- there is different

14 sections.  There is -- here's the report.  There's -- and other

15 sections.  I don't think it is giving away any privilege, but

16 there is a finding section and recommendation sections.  They

17 may not all be the same.

18         Again, I'm not making a ruling here.  I'm suggesting

19 things for you to think about it.  And, you know, as necessary,

20 you might want to do research, because if you have to litigate

21 it, I'm going to want to know what you say the law is on that.

22 Okay?

23         All right.  Anything further this morning?

24         MR. CARO:  Thank you, your Honor.

25         THE COURT:  All right.  One other thing, Mr. Caro,

without disclosing anything that you feel is inappropriate to

disclose, can you tell us the status of your medical condition

insofar it is a would bear on your ability to start coming to

court or attending meetings other than remotely?

MR. CARO: I think at least through August I'm going

to be undergoing examinations and testing. A week ago last

Monday I had another ultrascan done. I haven't gotten the

results back. And I have more exams to be submitted to. And

the doctor says, you know, just stay here.

The last few days including today, I tend to be light

headed, dizzy, and unstable on my feet.

So at least for the time being, until -- what should

be done is decided, I'm staying put, and I would rather not

travel -- personally would rather not travel in the heat.

Although it is hot down here if I stay at home.

THE COURT: Uh-huh.

All right. Is there anything further?

MS. BEDNAREK: No, your Honor.

THE COURT: All right. I know that you have a

discovery cutoff that looms, so you have got a lot of

depositions coming up.

I think that, Mr. Caro, you ought to be talking with

your local counsel to see, you know, what assistance, you know,

he can give you on some of these matters.

And obviously defense counsel is willing to cooperate

1    in terms of arranging for some of these proceedings to take

2    place remotely so that you can fully participate.

3         But I think that's something you need in fairness to

4    address with your local counsel.  Okay?

5         MR. CARO:  I have.  Local counsel (unintelligible).

6         THE COURT:  All right.  Very good.

7         All right.  I'll talk to everybody then on August 7th.

8         MR. CARO:  Thank you, your Honor.

9         MS. BEDNAREK:  Thank you, your Honor.

10         THE COURT:  Thank you.

11        (Which concluded the proceedings.)

12                         CERTIFICATE

13         I certify that the foregoing is a correct transcript

14    from the digital recording of proceedings in the above-entitled

15    matter to the best of my ability, given the limitation of using

16    a digital-recording system.

17

18

19    */s/Pamela S. Warren*                July 25, 2017
      Official Court Reporter              Date
20    United States District Court
      Northern District of Illinois
21    Eastern Division

22

23

24

25